UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60105-CIV-DIMITROULEAS/SNOW

ANGEL GABRIEL RAMOS,

      Plaintiff,

      vs.

KILOLO  KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits.  The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq., and was referred to United States Magistrate Judge Lurana S. Snow for Report and Recommendation.

## I. PROCEDURAL HISTORY

The Plaintiff filed an application for disability and Supplement Security Income (SSI) benefits on November 8, 2019, alleging disability since October 24, 2018 as a result of the effects of a stroke.  The application was denied initially and upon reconsideration.  The Plaintiff then requested a hearing, which was held before Administrative Law Judge Sylvia Alonso on April 9, 2020.  The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied the Plaintiff's request for review on November 24, 2020.  The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on February 27, 1964, and was 55 years old on the date of his application.  He has a high school education and his past relevant work was as a collections clerk and an Uber driver.  The Plaintiff has not worked since suffering a stroke in October 2018.  (R:31-37, 66)

The medical record reflects that on October 24, 2018, the Plaintiff presented to the emergency department of Broward Health Medical Center complaining of right side weakness and inability to speak.  He was diagnosed with acute cerebrovascular accident (CVA); left middle cerebral artery stroke, acute ischemic left ICA stroke and hyperlipidemia.  He was admitted to the hospital and discharged on October 27, 2018, with recommendations that he follow up as an outpatient for blood pressure control and quit smoking. (R:248)

On February 26, 2019, the Plaintiff presented to Roderick Santa Maria, M.D., for a consultative physical examination.  The Plaintiff told Dr. Santa Maria that he could no longer drive, and suffered from headaches, motion sickness and pain in his left upper and lower extremities.  He stated that he experienced tightness and cramping in his calves (claudication) after walking for about 5 minutes.  The Plaintiff was right hand dominant and had not stopped smoking.  Physical examination of the Plaintiff showed no edema.  His peripheral pulses were difficult to palpate, but he appeared to have adequate capillary refill.  The Plaintiff walked without a limp or an assistive device.  He was able to pull his shirt off over his head with both arms.  His speech was clear and mental status was normal.  Motor strength was 5/5 in all muscle groups with normal dexterity.  The Plaintiff had no significant weakness in the left lower extremity and his reflexes were active and symmetrical bilaterally.  A Doppler study of the Plaintiff's lower  extremities  revealed significant peripheral  artery

disease.  Dr. Santa Maria assessed peripheral artery disease with claudication after walking about 100 yards. (R:644-45)

On March 12, 2019, Steven Arkin, M.D., a state agency non-examining physician, completed a Physical Residual Functional Capacity Assessment of the Plaintiff.  Dr. Arkin opined that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk for 4 hours during an 8-hour workday and sit for 6 hours during a workday, and had an unlimited ability to push/pull within lift/carry restrictions.  The Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders/ropes/scaffolds.   He had no manipulative, visual or communicative limitations, but needed to avoid concentrated exposure to extreme heat and cold, wetness, noise, vibration. hazards such as machinery and heights, and fumes, odors, dusts, gases and poor ventilation.  The Plaintiff did not need to limit exposure to humidity.  Dr. Arkin stated that the Plaintiff's impairments did not meet or medically equal a listed impairment, and the doctor's residual functional capacity assessment took into account the Plaintiff's pain and limited range of motion. (R:59-62) Dr. Arkin's findings were affirmed on June 13, 2019, by Prianka Gerrish, M.D., another state agency non-examining physician. (R: 82-84)

On May 15, 2019, the Plaintiff presented to Sarah Wiggill, M.D., for his annual physical.  He reported continued numbness and weakness in his left arm and some weakness in his right hand, as well as calf pain when walking and some difficulty with memory.   He had been smoking since 1981 and at the time of the examination had cut down to ½ pack per day.  The Plaintiff was not interested in quitting.  Dr. Wiggill recommended that the Plaintiff obtain screening for colon and prostate cancer, increase exercise and quit smoking, and she ordered lab tests. (R:684-89)

The Plaintiff returned to Dr. Wiggill for follow-up on June 10, 2019.  He complained of intermittent numbness in his left arm and a tingling sensation in his right hand which was causing him to drop objects.  Dr. Wiggill noted that the Plaintiff's hyperlipidemia was poorly controlled and there was an onset of impaired fasting glucose level attributable to the Plaintiff's intake of soda, ice cream and junk food.  The Plaintiff told Dr. Wiggill that he was walking ½ mile 3-4 times per week and reported an improvement in claudication.  Physical examination revealed no cyanosis, edema, joint swelling or erythema; 5/5 strength in bilateral upper extremities; absent Tinel sign, and normal speech.  The Plaintiff could move all 4 extremities.  Dr. Wiggill's assessment was tingling; peripheral vascular disease; hyperlipidemia; impaired fasting glucose, and late CVD effects in the form of monoplegia of upper limb affecting left non-dominant side.  She counseled the Plaintiff on diet and nutrition.  (R:679-82)

The Plaintiff had another follow-up examination by Dr. Wiggill to review lab results on September 17, 2019.  The Plaintiff reported that he was trying to quit smoking.  He was taking medication for hyperlipidemia, but had run out of his hypertension medication 10-11 months earlier.  The Plaintiff complained of sharp shooting pain in his right hand during the night as well as claudication.  Physical examination revealed decreased (3-4/5) muscle strength in the Plaintiff's left upper extremity, with no other abnormalities. Tests revealed carpal tunnel syndrome in the Plaintiff's right upper limb, for which Dr. Wiggill prescribed Naproxen and a brace to wear while sleeping.  The doctor assessed uncontrolled hypertension, for which the Plaintiff's prescription medication was refilled; peripheral vascular disease in bilateral legs, for which she recommended medication, continued walking and tobacco cessation; well-controlled hyperlipidemia; improved fasting glucose; stable late stroke effects in

the form of monoplegia in the non-dominant upper limb, and nicotine dependence. (R:673-78)

Also on September 17, 2019, Dr. Wiggill completed a Physical Medical Source Statement for the Plaintiff. She opined that the Plaintiff could walk for 1 block; could sit for more than 2 hours at a time and stand for 5 minutes at a time during an 8-hour workday, and he could sit for a total of 6 hours and stand/walk for less than 2 hours during a workday. The doctor believed that the Plaintiff needed to shift positions during the day and would require a 15-minute break every 2 hours owing to muscle weakness, pain and/or numbness. The Plaintiff rarely could lift objects weighing less than 10 pounds. He could frequently stoop, but could rarely twist or crouch and could never climb ladders or stairs. The Plaintiff had significant limitations in reaching, handling and fingering. Dr. Wiggill stated that the Plaintiff would be off task 25% or more of the time and would have good days and bad days. Dr. Wiggill did not identify any mental/psychological impairments and concluded that the Plaintiff was capable of low stress work. (R:650-653)

On January 15, 2020, the Plaintiff returned to Dr. Wiggill for follow-up examination. The Plaintiff reported walking daily and continuing to taper off smoking. He complained of right shoulder pain and decreased range of motion, as well as bilateral hand joint pain, likely the result of arthritis. Physical examination of the Plaintiff's right shoulder revealed no tenderness, swelling, erythema or warmth. Range of motion was intact except for decreased forward flexion and abduction. Neer's sign was present, but empty can test and Hawkin's test were negative. Dr. Wiggill counseled the Plaintiff to lose weight, exercise, improve his diet and stop smoking. She provided him with range of motion exercises for rotator cuff syndrome. (R:667-72)

The Plaintiff testified at the administrative hearing that he suffered from numbness in his left arm, right hand and right shoulder, so that he had a hard time grabbing and holding onto things.  He had difficulty turning doorknobs and also had difficulty walking because of calf pain he experienced after walking about 20 yards.  The Plaintiff also was having memory problems in that he had a hard time recognizing things.  The Plaintiff stated that it was hard for him to lift a phone and type something, and that he did not have a memory of how to do his prior job.  He struggled to get from one place to another.  (R:38-44)

Gary Fannin, a vocational expert (VE) identified the Plaintiff's past work as collections clerk, which is classified as sedentary with an SVP of 5, and taxi driver, which is medium exertional level with an SVP of 3.  The VE was asked to consider an individual of the same age, education and work experience as the Plaintiff. who could perform the full range of light work except that he could stand/walk for 4 hours and sit for 6 hours during an 8-hour day; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; could never climb ladders or scaffolds, and could not be exposed to hazards.  The VE testified that such a person could perform the Plaintiff's past job as collections clerk.  Additionally, the Plaintiff's skills were transferrable to customer service jobs.  The VE stated that his opinion was consistent with the Dictionary of Occupational Titles (DOT).  (R:46-47)

In response to questions posed by counsel for the Plaintiff, the VE stated that the same individual could perform the job of collections clerk if he were limited to lifting 10 pounds occasionally and less than 10 pounds frequently, and also limited to occasional handling, fingering and feeling with his left hand.  The VE explained that the job required only occasional handling, and frequent fingering could be performed with the individual's dominant right hand.  The VE stated that the same person still

could perform this job if he were limited to occasional reaching with the non-dominant arm.  However, the individual could not do the job of collections clerk if he were limited to performing simple, routine, repetitive tasks because of extensive memory deficits. (R:47-51)

### III. <u>DECISION OF THE ALJ</u>

The ALJ first found that the Plaintiff met the insured status requirements of the Social Security Act through June 20, 2021; had not engaged in any substantial gainful activity since his alleged onset date of  October 24, 2018, and had severe impairments of status post cerebral vascular accident and peripheral vascular disease.  The ALJ found that other impairments mentioned in the Plaintiff's treatment notes: right carpal tunnel syndrome, osteoarthritis in the hands, hypertension, hyperlipidemia and excema were not severe and were controlled with conservative, noninvasive measures.  (R:12-13)

The ALJ also found that the Plaintiff did not have a medically determinable cognitive impairment, as he alleged at the hearing.  The ALJ pointed out that although treatment records did mention memory deficits, there were no mental status examination findings, diagnoses or treatment for any cognitive impairment. The Plaintiff denied depression, anxiety and suicidal ideation, and the Plaintiff's treating physician noted no emotional factors impacting the Plaintiff's ability to work. Consequently, there had been no formal mental evaluation, no evidence of psychiatric abnormalies on examination and no evidence of treatment for psychiatric symptoms. The ALJ also found that although the Plaintiff's weight and body mass index supported a diagnosis of obesity, the record contained no allegations pertaining to this condition. (R:13)

The ALJ next determined that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. §404, Subpart P, Appendix 1.  The ALJ assessed that the Plaintiff had the residual functional capacity to perform light work, except that he could stand/walk for 4 hours and sit for 6 hours during an 8-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds, and could not tolerate exposure to vibrations or hazards.  The ALJ noted that although the Plaintiff testified that he had problems turning doorknobs and walking more than 20 yards, and had issues with his left hand, he complained primarily of problems with memory and cognition.  The ALJ determined that although the Plaintiff's medical impairments reasonably could be expected to cause the alleged symptoms, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence in the record.  (R:14-15)

The ALJ observed that the Plaintiff's condition required very limited intervention, consisting of primarily conservative treatment.  Examination results yielded evidence of some physical limitations, but did not support restrictions beyond the ALJ's residual functional capacity assessment.  After summarizing the treatment records of Dr. Wiggill, the Plaintiff's treating physician, the ALJ noted that the doctor had suggested activities which supported retained functioning by the Plaintiff.  Although Dr. Wiggill's notes indicated some reduction in the Plaintiff's overall abilities, the notes also suggested that the Plaintiff had managed to continue to engage in activities consistent with standing and walking at least 4 hours per day. The ALJ stated that she had adopted the restrictions to light work with a reduction in standing

and walking based on the Plaintiff's complaints of claudication and his reduced ability to use his left hand.  (R:15-16)

The ALJ found Dr. Wiggill's residual functional capacity assessment not persuasive.  She noted that the doctor's treatment records showed a retained ability to move all extremities, and contained occasional findings of 5/5 strength, with some references to reduced strength of 4+ or 3-4 in the left upper extremity.  The Plaintiff reported smoking regularly, which somewhat undermined his complaints of inability to use his hands, and did not report relying on others for dressing, bathing or feeding.  Moreover, examination findings by the consultative physician addressed only issues with reduced sensation in the Plaintiff's right hand, and noted the Plaintiff's ability to take off his shirt over his head.  Additionally, Dr. Wiggill's assessment that the Plaintiff could walk only 1 city block was inconsistent with the Plaintiff's own statements that he walked ½ mile multiple times per week.  The ALJ pointed out that Dr. Wiggill had acknowledged that the Plaintiff could sit for 6 hours per day, but found that the doctor's other stated limitations were not entirely consistent with her own treatment notes or the consultative examiner's report.  Thus, the ALJ concluded that Dr. Wiggill had provided insufficient support to establish her assessed degree of restriction.  (R:16-17)

The ALJ noted that Dr. Santa Maria's consultative examination report offered no opinion regarding the Plaintiff's limitations and abilities, but examination findings supported the ALJ's residual functional capacity assessment.  The ALJ also determined that the findings of the non-examining state agency physicians were generally persuasive and adequately supported by the records they had reviewed.  The ALJ emphasized that the Plaintiff had sought almost no treatment following his stroke, and had not begun seeing a regular provider until May 2019.  While treatment

records showed some ongoing issues pertaining to a history of stroke, including some evidence of weakness, those records also showed the Plaintiff's retained ability to move his extremities in all directions and walk ½ mile 3-4 times per week.  Thus, the ALJ adopted most of the residual functional capacity assessments of the non-examining physicians, with the exception of some of their assessed environmental restrictions. The ALJ stated that this was because the Plaintiff had continued to smoke and because records otherwise failed to support the additional environmental restrictions.  (R:17)

Based on the testimony of the VE, the ALJ found that the Plaintiff retained the residual functional capacity to perform his past relevant work as collections clerk, as generally and actually performed.  Accordingly, the Plaintiff had not been under a disability for purposes of the Social Security Act.

## IV. <u>CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

The Plaintiff seeks reversal or remand on two grounds: (1) the ALJ erred by failing to properly evaluate Dr. Wiggill's opinion, and (2) the Plaintiff was entitled to a new hearing since the Commissioner lacked the ability to delegate authority to the ALJ and the Appeals Council because the Commissioner's appointment was unconstitutional.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. <u>RECOMMENDATIONS OF LAW</u>

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence.  "Even

if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985).  Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520.  First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second, the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four.  In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work.  The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five.  The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to  perform such work.

## A. Assessment of Dr. Wiggill's Opinion

The Plaintiff first contends that the ALJ failed to accord proper weight to the opinion of Dr. Wiggill, the Plaintiff's treating physician.  For claims filed after March 27, 2017, 20 C.F.R. § 1520c(a) provides that no deference or specific evidentiary weight, including controlling weight, is to be given to any medical opinion or prior administrative finding, including those of a treating source.  Instead, each opinion or prior finding is evaluated by considering the factors set forth in § 1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of treatment relationship and examining relationship; (4) specialization, and (5) other factors, such as familiarity with the other evidence in the claim or an understanding of the program's policies and evidentiary requirements. Of these factors, the most important are supportability and consistency.

The Plaintiff asserts that in evaluating Dr. Wiggill's opinion, the ALJ explicitly addressed the supportability factor but failed to discuss the consistency factor.  The regulations state that the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be" 20 C.F.R. § 1520c(c)(2). The undersigned notes that although the ALJ did not label any portion of her  decision "consistency factor,"  she clearly found that Dr. Wiggill's opinion was inconsistent with her own treatment notes, the findings of Dr. Santa Maria, the consultative examiner and the Plaintiff's own testimony.  The undersigned finds that the ALJ's determination that the limitations assessed by Dr. Wiggill were not entirely persuasive is supported by

substantial evidence in the record, and the Plaintiff is not entitled to relief on this ground.

### B. Delegation of Authority to the ALJ and Appeals Council

The Plaintiff second and final argument is that he was denied his right to a legitimate and valid hearing because the statute governing the appointment of the Commissioner is unconstitutional and, as a result, the Commissioner's delegation of authority to the ALJ and the Appeals Council was invalid.  The Plaintiff contends that he was injured because (1) he did not receive a constitutionally valid hearing and adjudication from an ALJ; (2) he did not receive a constitutionally valid decision from an ALJ; (3) he received an unfavorable decision from this constitutionally illicit ALJ adjudication process; (4) he did not receive a constitutionally valid process from the Appeals Council, and (5) did not receive a constitutionally invalid determination by the Appeals Council.

The Plaintiff's argument rests on the Supreme Court's decisions in Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S.Ct. 2183 (2020) and Collins v. Yellen, 141 S.Ct. 1761 (2021).  Both cases dealt with appointment procedures for agency heads which permitted the President to remove those individuals only for cause.  Seila Law dealt with the "for cause" removal restriction on the President's power to remove the director of the Consumer Financial Protection Bureau (CFPB), holding that the removal provision violated constitutional separation of powers.  However, the Court determined that the unconstitutional removal provision was severable from other provisions relating to the agency's structure.

Collins involved a similar restriction of the President's power to remove the director of the Federal Housing Finance Agency (FHFA).  The Court found this

13

provision likewise violated separation of powers, but again determined that the

provision was severable.  Accordingly, the Court held:

> All the officers who headed FHFA during the time in
> question were properly *appointed*.  Although the statute
> unconstitutionally limited the President's authority to
> *remove* the confirmed Directors, there was no constitutional
> defect in the statutorily prescribed method of appointment
> to that office.  As a result, there is no reason to regard any
> of the actions taken by the FHFA . . . as void.

Collins, 141 S.Ct. at 1787 (emphasis in original).

The action challenged in Collins involved the transfer of billions of dollars in

capital to the Department of the Treasury by Fannie Mae and Freddie Mac, which

those companies sought to rescind.  The Court held that the relief sought was

unavailable because the action had been adopted by the Acting Director of the FHFA,

who was removable at will.  However, the Court also held that the aggrieved parties

could be entitled to some form of retrospective relief if they could show that they were

directly harmed by unconstitutional removal provision:

> Suppose, for example, that the President had attempted to
> remove a Director but was prevented from doing so by a
> lower court decision holding that he did not have "cause" for
> removal.  Or suppose that the President made a public
> statement expressing displeasure with actions taken by a
> Director and had asserted that he would remove the
> Director if the statute did not stand in his way.  In those
> situations, the statutory provision would clearly cause
> harm.

Collins, 141 S.Ct. at 1789.  Because the parties disputed whether such a situation

existed. the Supreme Court remanded the case for further proceedings.  Id.

In the instant case, the Plaintiff contends that the removal provision applicable

to Commissioner of Social Security Andrew Saul, 42 U.S.C. § 902(a)(3), also violates

separation of powers.  That section states that the Commissioner is appointed to a six-

year term and may only be removed from office "pursuant to a finding by the President

of neglect of duty or malfeasance in office." The Commissioner, while not expressly conceding that this provision is unconstitutional, does not argue against it. Instead, the Commissioner advances two primary arguments: (1) the ALJ who issued the decision in the Plaintiff's case was not appointed by a Commissioner subject to the § 902(a)(3), since the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the provision, and (2) the Plaintiff has not demonstrated any harm resulting from the removal provision.[1]

The Plaintiff has not cited any case which has adopted his position, and the undersigned could not locate any. In Stanfird v. Kijakazi, No. 20-CV-1630-GPC(BLM), 2021 WL 5634177, *4 (S.D. Cal. Dec. 1, 2021) and Perez Kocher v. Comm'r of Soc. Sec., No. 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, *5-6 (M.D. Fla. Nov. 23, 2021), the courts accepted the Commissioner's argument that no relief was warranted because the ALJ who rendered the unfavorable decision in question had been re-appointed by Acting Commissioner Nancy Berryhill. The undersigned agrees with this conclusion and finds that it applies to the Plaintiff because the appointment of the ALJ in his case had been ratified by Acting Commissioner Berryhill.

Other cases uniformly have denied relief because the plaintiffs could not demonstrate any harm caused to them by the removal provision. See, e.g. Michele T. v. Comm'r of Soc. Sec., No. 3:20-cv-06085-JRC, 2021 WL 5356721, *5-6 (W.D. Wash. Nov. 17, 2021); Rhonda Lynn Tibbetts v. Comm'r of Soc. Sec., No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, *6 (M.D. Fla. Dec. 21, 2021); Carolyn M.D.

---

1. The Commissioner cites additional doctrines in response to the Plaintiff's position: harmless error, de facto officer, the rule of necessity and broad prudential considerations (ECF No. 21, 22-25). Since the undersigned agrees with the Commissioner's two primary arguments, these doctrines will not be addressed.

v. Kijakazi, No. 2:20-cv-06725-AFM, 2021 WL 6135322, *12 (C.D. Cal. Dec. 28, 2021).

In this regard, the Court in Michele T., 2021 WL 5356721, * 5, noted:

> [T]here is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner.   Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. . . .
>
> There is also nothing showing former President Trump would have removed Commissioner Saul and appointed a new Commissioner who would have administered this plaintiff's claims differently.

The harm identified by the Plaintiff in this case is the fact that he received unfavorable decisions from an ALJ and Appeals Council pursuant to delegation of duties to those officers by Commissioner Saul, who was operating under an unconstitutional removal clause.  Clearly this is not sufficient, as it would apply to virtually every disability case since the enactment of § 902(a)(3) and would render meaningless Collins' requirement of direct harm. See, Carolyn M.D., 2021 WL 6135322, *12.  The Plaintiff has failed to demonstrate that the removal provision had any actual or possible impact on the unfavorable decision he received, and no relief is warranted on this ground.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment be DENIED, and the Commissioner's Motion for Summary Judgment be GRANTED.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any,

with  the Honorable William P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained therein, except upon grounds of plain error if necessary in the interest of justice.  <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 26th day of January, 2022.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record